# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2014-CA-00453-COA

**AUDREY SPRABERRY BEASLEY** <span style="float:right">**APPELLANT**</span>

**v.**

**ROBERT "TREY" SUTTON** <span style="float:right">**APPELLEE**</span>

| | |
|---|---|
| DATE OF JUDGMENT: | 11/19/2013 |
| TRIAL JUDGE: | HON. ROGER T. CLARK |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | DAVID PAUL PITRE |
| | GRAHAM PATRICK CARNER |
| ATTORNEYS FOR APPELLEE: | ROBERT THOMAS SCHWARTZ |
| | JEFFREY WARD BERTUCCI |
| NATURE OF THE CASE: | CIVIL - OTHER |
| TRIAL COURT DISPOSITION: | SUMMARY JUDGMENT GRANTED TO APPELLEE |
| DISPOSITION: | AFFIRMED IN PART, REVERSED AND REMANDED IN PART - 10/27/2015 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE GRIFFIS, P.J., BARNES AND JAMES, JJ.**

**BARNES, J., FOR THE COURT:**

¶1.     This dispute arose from the disbursement of $5 million in life-insurance proceeds to Dr. Robert "Trey" Sutton from various policies of Dr. Christopher Spraberry after Spraberry's accidental death.  Audrey Spraberry Beasley, Spraberry's sister, originally sued Sutton, among others,[1] for unjust enrichment, equitable estoppel, and promissory estoppel.

---

[1] Beasley also sued certain insurance companies and agents, but these claims were later severed and removed to federal court.

She claims that one of the policies under which Sutton collected $2 million was supposed to be cancelled; instead, a policy in the amount of $700,000 was mistakenly cancelled, which named Beasley as the sole beneficiary. The Circuit Court of Harrison County granted summary judgment in favor of Sutton. Beasley now appeals. We affirm the grant of summary judgment to Sutton on the promissory-estoppel claim, but reverse and remand on the unjust-enrichment and equitable-estoppel claims.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

¶2.     Spraberry was a dentist and the majority shareholder of Spraberry Dental Clinic in Gulfport, Mississippi. In May 2009, Spraberry died following an accident at his home. Beasley was Spraberry's sister and employed as office manager at the clinic for much of the time from January 2002 to January 2011.

¶3.     In 2006, Sutton entered into dental practice at the clinic with Spraberry immediately upon receiving his license. He had a twenty-five percent partnership interest. Upon Spraberry's death, Sutton received $5 million in life-insurance proceeds. Sutton currently owns the clinic and practice, having purchased Spraberry's interest.

¶4.     This dispute arose over the various insurance policies Spraberry had purchased; specifically, a $700,000 policy for which Beasley was the beneficiary, and which had lapsed, and to a lesser extent a $2 million policy that Beasley claims was erroneously in place and benefitted Sutton. In 2008, Kyle "Kraig" Kepper, an issuing agent at The Producer's Group Inc., assisted Spraberry in obtaining several life insurance policies from The Guardian Life Insurance Company (Guardian). In February 2008, Kepper helped Spraberry convert his

2

preexisting $700,000 Guardian term policy to a whole-life policy (policy number 5937894) with Beasley as the primary beneficiary.[2] On April 15, 2008, Guardian issued two other separate policies: a term-life policy in the amount of $2 million, with Sutton as the sole owner and beneficiary (policy number 5422550); and a whole-life policy in the amount of $1 million, owned by Spraberry (policy number 5419519), with Spraberry's wife and child as the beneficiaries. The premium for the $2 million policy was paid for by the clinic, and this policy was intended to fund a buy-sell agreement executed between Spraberry and Sutton to preserve the dental practice in the event of either dentist's untimely passing. Sutton claimed this policy was the only one tied into the buy-sell agreement at the time.[3] The partners' plan was that the $2 million policy would remain in place for ten years to give Sutton time to acquire sufficient ownership shares in the clinic, and eventually the policy would no longer be needed to buy Spraberry's shares in the event of his death.

¶5.     In November 2008, Spraberry discussed with Teri Eaton, a local insurance agent, the purchase of some other life insurance. They decided a $3 million policy would be sufficient to cover the purchase of the clinic in the event either dentist untimely passed away. Eaton's understanding was that the $3 million policy would replace any other policies used to fund the buy-sell agreement.[4] Spraberry and Eaton never discussed replacing the $700,000

---

[2] Spraberry had listed Beasley as the beneficiary on the term-life policy in 2003.

[3] In contrast, Beasley testified that both the $1 and $2 million policies were intended to cover a buyout of the practice should either dentist pass away.

[4] At the time, Eaton testified that she thought the $3 million policy was replacing just the $1 million policy to fund the buy-sell agreement, not the $2 million policy, which she did not know of until she filled out the replacement form in December 2008. Eaton stated

Guardian policy with another policy. After the discussion, a $3 million whole-life insurance policy issued by Phoenix Life Insurance Company (Phoenix) was obtained. On December 5, 2008, Phoenix sent a replacement notice to Guardian, listing the policy numbers for the $1 million and $2 million policies, and stating it had received an application for new insurance, which indicated an intention to replace these existing Guardian policies.

¶6.     Once the Phoenix insurance policy was established, Beasley stated that Spraberry instructed her on December 7, 2008, to cancel the $1 million and $2 million Guardian policies because the $3 million Phoenix policy was replacing them. Thus, on December 8, 2008, Beasley said she drafted a letter for Spraberry that specifically requested cancelling the draft payments for the two policies. Beasley also listed two policy numbers in the letter, but instead of the number for the $2 million policy, she mistakenly listed the number for the $700,000 policy. The letter was faxed to Kepper, but Guardian never received the request to cancel the two policies. Two weeks after receipt of the letter, Kepper realized the policy numbers did not match the coverage amounts.

¶7.     Guardian representative Denise Stoudt noted Spraberry did not have the authority to cancel the $2 million policy, since Sutton was its sole owner. Also, Sutton was not aware of the December 8 letter. On December 15, 2008, Spraberry executed two stop-payment orders to terminate automatic drafts for the premiums on the two Guardian policies in the letter: the $1 million and $700,000 policies.

that at no time was the figure of $5 million in life insurance discussed to fund a buy-sell agreement. Sutton's testimony contradicts the assertion that Spraberry intended to replace the $2 million policy with the $3 million policy. Beasley testified that the $3 million policy was to replace both the $1 million and $2 million policies.

4

¶8.     Kepper testified that soon after he received the stop-payment notices about Spraberry's Guardian policies, he called Spraberry's home and spoke with his wife, Tracey. Kepper explained to her that he was "urgently trying to get in touch with [Spraberry] but he [had] not called back" about a "possible mix-up" or some "confusion." Kepper was especially concerned with the $700,000 and $1 million whole-life policies that were taken off-payment and in their first year, and that Spraberry could lose money. Kepper continued to call Spraberry between December 2008 and when Spraberry died in May 2009, leaving numerous voice-mail messages in order to talk about the December 8 notice of cancellation. Spraberry never returned Kepper's calls and declined meeting with him. Beasley admitted that Spraberry was just not interested in speaking with Kepper about the Guardian policies. Kepper also spoke with Sutton to try to find out Spraberry's intentions about cancelling the Guardian policies. Guardian sent several lapse notices to Spraberry, requesting he reinstate the policies. The termination date of the $700,000 policy for nonpayment of premiums was December 20, 2008. Both the $700,000 and $1 million policies lapsed for failure to pay the premiums.

¶9.     On May 5, 2009, shortly before Spraberry died, in response to an inquiry from Beasley about the insurance policies Spraberry had through Kepper's agency, Kepper wrote that he knew "from speaking to [Sutton] that one of these [policies] was not intended to be cancelled." Kepper also stated that Beasley was aware of the cancellation of the $700,000 policy before Spraberry's death. Additionally, Beasley testified that before Spraberry's death, Sutton was aware of the $700,000 policy that had her listed as a beneficiary.

5

¶10. Spraberry died in an accident at his home on May 16, 2009. Beasley also claimed she confronted Sutton and told him that Spraberry intended to cancel the $2 million policy in favor of the $3 million policy, and not the $700,000 that named her as a beneficiary. Beasley testified that Sutton promised to "make it right." Beasley stated that after Spraberry died,

> when it came to light that the [$700,000] policy no longer existed, Dr. Sutton said that he was aware that [Spraberry] wanted me to receive that money, that those were [Spraberry's] wishes, and that he was going to see that that happened. He was going to follow through with [Spraberry's] wishes and make sure that . . . I received the money.

¶11. Beasley offers evidence that Sutton told others of his promise to pay her the $700,000. Tom Hensley signed an affidavit stating that the afternoon of Spraberry's funeral, he witnessed Sutton telling Spraberry and Beasley's father, Dr. Clyde Spraberry (also a dentist practicing at the clinic), "I just want you to know, Doc, I am going to honor all of [Sprayberry]'s wishes with regard to [Spraberry] and [Beasley]." Hensley was impressed by Sutton's statement and told Beasley about it. Clyde Spraberry also testified:

> I didn't feel like it was [Spraberry's] intent to make [Sutton] a multimillionaire due to his death and that he wanted certain things done. One of them, in particular, was to pay his debts and that he had told me about the $700,000 to [Beasley]. Previously, Dr. Sutton had already given [Beasley] and my son, Clay, $100,000. [Sutton] agreed and said that that was not his intent. . . . [H]e wanted to honor [Spraberry's] wishes and do what he was supposed to do. I said, does that mean you're going to write her a check? He said, well, I think she should check with our accountant or somebody to see what would be the best way to do that and avoid taxes.

¶12. On December 10, 2009, Sutton paid Beasley $100,000.[5] Sutton claims this payment

---

[5] Sutton claimed he paid Beasley $100,000 because Spraberry's unsigned will expressed the request to pay Clay Spraberry, Beasley and Spraberry's brother, $100,000, and if Sutton was going to pay Clay that amount, he wanted to do the same for Beasley. Spraberry's will had no such provision for Beasley.

6

was a gift to Beasley in consideration of Spraberry's estate; Beasley claims it was partial payment for the $700,000 policy.

¶13. Beasley testified that she spoke with Sutton between May and December 2009 about the life-insurance payouts.[6] Sutton told Beasley the $3 million policy had paid out very quickly, but he was still waiting on the $2 million payout. In May 2010, Beasley spoke with the clinic accountant, who told her Sutton had been paid both the $2 million Guardian policy and the $3 million Phoenix policy. Beasley claimed that Sutton told her once the $2 million paid out, "he would make it right and would follow through with [Spraberry's] wishes."[7] When Beasley found out the policy had been paid out, she requested a meeting with Sutton "to see where we stood."

¶14. On May 11, 2010, Beasley claimed she met with Sutton and reminded him about statements he made of "mak[ing] it right" and Spraberry's intent for her to have $700,000 from the mistakenly cancelled life insurance policy. She stated that Sutton told her he would talk to the clinic accountant, but it was not a good business decision to simply write a check due to the tax consequences.

¶15. In the fall of 2010, Beasley and her husband had found a home they wanted to purchase. Sutton encouraged Beasley to buy it. When Beasley told Sutton she could not afford it, she claims Sutton "smiled and hugged [Beasley] and told [her] yes you can."

---

[6] Sutton had made a claim for both the $2 million Guardian policy, in which he was the sole beneficiary, and the $3 million Phoenix policy, in which both he and Spraberry were beneficiaries, insuring the lives of the other. Sutton used a portion of these funds to purchase the clinic from Tracey and to operate the clinic.

[7] Sutton denies making this statement.

7

Sutton denied this response.

¶16.    On December 20, 2010, Beasley claims that she again discussed with Sutton payment of the remaining $600,000, and he further discussed his concern about the best way to pay her and avoid tax consequences.  She stated that Sutton discussed with an attorney payout options that sounded good, and Beasley should let the clinic accountant know.  On December 31, 2010, Beasley and her husband entered into a real-estate contract to purchase the above-mentioned home.  She claimed they did so in reliance on Sutton's alleged promises to pay her the remaining $600,000.

¶17.    In January 2011, Beasley and Sutton exchanged text messages regarding the life-insurance funds, which Beasley claims furthers her claims.

> Beasley:    Hey!  Sorry to bother [yo]u on [yo]ur trip, but [the accountant] won't return my emails or phone calls.  I feel like [he] is avoiding me & that makes me panic just a little!  Were y'all able to talk last week after he & [the attorney] spoke on Wednesday?
>
> Sutton:    Just got [yo]ur message. . . .  I talked to [the accountant] Friday and he had more questions for [the attorney].  He did not say when he would get back with us.  Why are [yo]u panicing [sic]?
>
> Sutton:    Talked to him on Thursday not Friday.
>
> Beasley:    Well, I told him the urgency in finalizing this [be]cause we can't move forward w/the house unless all of this is settled & we have access to these funds.  Hence, the panic :(
>
> Sutton:    Just got in.  Long ride home in sleet, ice, and rain and getting unloaded.  We will get with [the accountant] sometime tomorrow and see what's up.

In mid-January, Beasley and Sutton had a final meeting at the clinic.  Sutton told her the money he had already given her "was out of the goodness of his heart [and] not for any other

8

obligation. And as far as he was concerned, all of the insurance money was paid out as it should be and he had no guilt about any of that." Realizing Sutton was not going to pay her the remaining $600,000, Beasley resigned as the clinic's office manager. At the end of January 2011, she also purchased the home she had contracted to buy.

¶18. Spraberry's widow did not know of the $3 million policy until May 2013, when she was advised by Beasley's attorney. It was her understanding that the funds of any policy listing Sutton as beneficiary were intended to go to her and her children as part of the buy-sell agreement on the dental practice.[8] Tracey was aware of the $700,000 Guardian policy Spraberry had maintained with Beasley as beneficiary, but Spraberry never mentioned to her that he intended to cancel it. Sutton stated it was not his understanding that the $3 million policy was to replace the $2 million Guardian policy. He also claimed that Spraberry intended to list him as beneficiary for $5 million in total life-insurance coverage "to cover our business."

¶19. In October 2011, Beasley filed her complaint against Sutton and certain insurance companies and agents[9] in Harrison County Circuit Court seeking to recover the amount of $700,000. She raised three causes of action relating to Sutton: unjust enrichment, promissory estoppel, and equitable estoppel. Following completion of discovery, Sutton filed a motion for summary judgment. The trial court granted summary judgment to Sutton on all of

---

[8] The closing statement from the sale of the dental practice after Spraberry's death shows Tracey received just over $1.5 million of the $5 million in life-insurance proceeds distributed to Sutton. Sutton received approximately $2.65 million in insurance, plus the dental practice.

[9] Beasley also sued Guardian, Kepper, and The Producers Group.

Beasley's claims.

## STANDARD OF REVIEW

¶20. The appellate court applies a de novo standard of review when analyzing a trial court's grant or denial of a motion for summary judgment. *Kihullen v. Kan. City S. Ry.*, 8 So. 3d 168, 174 (¶14) (Miss. 2009). The evidence will be "viewed in the light most favorable" to the nonmoving party. *Id.* A party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories and admissions of file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." M.R.C.P. 56(c). The burden of proving there is no genuine issue of material fact is on the moving party. *Buckel v. Chaney*, 47 So. 3d 148, 153 (¶10) (Miss. 2010).

## ANALYSIS

¶21. Beasley argues that the trial court erred in granting summary judgment to Sutton on her claims of unjust enrichment, equitable estoppel, and promissory estoppel. In his motion, Sutton argued that Beasley failed to provide probative evidence that: (1) Sutton was enriched at Beasley's expense through his receipt of life-insurance proceeds for which he was the sole beneficiary; (2) Beasley reasonably and justifiably relied upon the representations and conduct of Sutton and changed her position to her detriment; and (3) Sutton made an enforceable promise to pay her $700,000. Finding genuine issues of material facts for unjust enrichment and equitable estoppel, we reverse and remand summary judgment as to those claims. However, we find no factual dispute related to promissory estoppel, and affirm on

10

that claim.

## I.     Unjust Enrichment

¶22.    Beasley argues in her complaint that Sutton was unjustly enriched due to her clerical mistake in the December 8, 2008 letter by inserting the wrong policy numbers.  Because of this error, Sutton received $2 million[10] in extra life-insurance proceeds.  Beasley claims that she is entitled to restitution of $700,000 – the amount of the life insurance policy where she was named as beneficiary, which lapsed before Spraberry's death.  Beasley maintains that Spraberry did not intend to cancel the $700,000 policy, but instead the $2 million policy, of which Sutton was sole owner and beneficiary.

¶23.    Unjust enrichment applies "to situations 'where there is no legal contract and 'the person sought to be charged is in possession of money or property which in good conscience and justice he should not retain but should deliver to another.'"[11]  *Ground Control LLC v. Capsco Indus. Inc.*, 120 So. 3d 365, 371 (¶13) (Miss. 2013) (quoting *Powell v. Campbell*, 912 So. 2d 978, 982 (¶14) (Miss. 2005)).  "[T]he basis for an action for 'unjust enrichment' lies in a promise, which is implied in law, that one will pay to the person" what in equity is his or hers.  *Magnolia Fed. Sav. & Loan Ass'n v. Randal Craft Realty Co.*, 342 So. 2d 1308,

---

[10]  Sutton received $5 million total in life-insurance proceeds – $3 million from the Phoenix policy bought to cover the buy-sell agreement, and $2 million from the Guardian policy.

[11]  Beasley takes issue with some of the supreme court's recent statements on unjust enrichment, which state that an actual exchange of money or mistaken payment is made: "Money paid to another by mistake of fact, although such mistake may have been caused by payor's negligence, may be recovered from the person to whom it was paid, in an action for money had and received." *Willis v. Rehab Solutions PLLC*, 82 So. 3d 583, 588 (¶14) (Miss. 2012) (quoting *Union Nat'l Life Ins. v. Crosby*, 870 So. 2d 1175, 1180 (¶14) (Miss. 2004)).

11

1311 (Miss. 1977) (citing 17 C.J.S. *Contracts* § 6). "[A]ny conduct of one party from which the other party may draw the inference of a promise is effective" to determine if there is a contract implied in fact. *Id.* at 1312 (citing *Cooke v. Adams*, 183 So. 2d 925, 927 (Miss. 1966)). "An unjust enrichment action is based on the equitable principle 'that a person shall not be allowed to enrich himself unjustly at the expense of another.'" *1704 21st Ave. Ltd. v. City of Gulfport*, 988 So. 2d 412, 416 (¶10) (Miss. Ct. App. 2008) (quoting *Koval v. Koval*, 576 So. 2d 134, 137 (Miss. 1991)).

¶24. On appeal, Sutton maintains that Beasley cannot establish that he was paid funds which he was not entitled to receive and that funds should have been paid to Beasley. Additionally, Sutton argues that Beasley cannot connect any action or wrongdoing by Sutton to the mistake of the lapse or cancellation of the $700,000 policy. Finally, he argues that Beasley is attempting to litigate Spraberry's intentions with regard to the $700,000 and $2 million policies in order to create a genuine issue of material fact.

¶25. It is undisputed that the clinic paid for the life-insurance premiums, and Sutton owned the $2 million policy and was the sole beneficiary. Even so, we find that there is a genuine issue of material fact for unjust enrichment. Here, there was no legal contract that Sutton pay Beasley the $700,000, but there were facts that could indicate an implied contract in equity that she receive these funds. Foremost, whether the $100,000 payment by Sutton to Beasley was a gift or partial payment of the $700,000 in lapsed life-insurance proceeds constitutes a jury question. Sutton claimed it was a gift because Spraberry's will only provided $100,000 to Beasley's brother Clay. Sutton explained he wanted Beasley to have the same

12

gift, even though this gift was not specified in Spraberry's will. It could be surmised that the reason Beasley did not receive the $100,000 gift in Spraberry's will is because she would be the beneficiary of $700,000 in life-insurance proceeds. In contrast, Beasley claimed the $100,000 was partial payment for the $700,000.[12]

¶26. While Sutton did not explicitly promise to pay Beasley $700,000, an inference of a promise to pay funds she should have received can be drawn through conduct. *See Magnolia Fed. Sav. & Loan Ass'n*, 342 So. 2d at 1311. Beasley claimed that Sutton told her he "would make it right" regarding the lapse of the $700,000 policy. The $100,000 payment could imply that Sutton intended to pay Beasley the $700,000, knowing the $2 million he received was a windfall based in part on an error by Beasley. Moreover, it is unlikely that Spraberry intended Sutton to receive a total of $5 million upon his death,[13] when Sutton was only two years out of dental school, and Spraberry had recently determined with Eaton that $3 million was sufficient to fund a buy-sell agreement for the clinic.

¶27. Sutton argues Beasley's statements are "self-serving" and not backed by evidence, but we are not persuaded by this argument. Both Hensley and Clyde Spraberry also testified that Sutton wanted "to honor [Spraberry]'s wishes." Beasley also claimed Sutton stated he would "make it right" and follow through with Spraberry's wishes once the funds from the $2

---

[12] Sutton contends that Beasley later admitted the $100,000 was a gift, but during oral argument, Beasley's attorney clarified that she stated Sutton said it was a gift; she did not.

[13] $5 million was also more than three times the amount Spraberry's widow received from the sale of the clinic to Sutton.

million policy were received.[14] She stated Sutton had also spoken to the clinic's accountant about the best way to make the transaction. These instances all indicate a genuine issue of material fact regarding a claim for unjust enrichment, which should be resolved by a jury.

## II. Equitable Estoppel

¶28. Beasley asserts that there are contested issues of fact regarding a claim for equitable estoppel. We agree. To establish equitable estoppel, a plaintiff "must show: (1) that [s]he changed [her] position in reliance upon the conduct of another, and (2) [s]he suffered detriment caused by this change of position in reliance upon such conduct." *Turner v. Terry*, 799 So. 2d 25, 37 (¶42) (Miss. 2001) (citing *PMZ Oil Co. v. Lucroy*, 449 So. 2d 201, 206 (Miss. 1984)). Usually, "equitable estoppel is a rule of justice which prevails over all other rules." *Koval*, 576 So. 2d at 137. A promise is not required for this claim – the inducement may originate from words or conduct upon which the person relied and then changed her position. *Id.* "[T]he test is whether 'it would be substantially unfair to allow a person to deny what he has previously induced another to believe and take action on.'" *Id.* at 138 (quoting *PMZ Oil Co.*, 449 So. 2d at 207). "Fraudulent intent to mislead or deceive" is not required, only "substantial inequality." *PMZ Oil Co.*, 449 So. 2d at 207.

¶29. Sutton argues Beasley cannot prove a change in her position due to detrimentally relying on any conduct or representations by him, and she suffered no detriment even if she did rely on any of his actions or statements regarding the $700,000. We disagree, finding there are factual disputes on the elements of equitable estoppel.

---

[14] Although it is unclear what "make it right" means, obviously Sutton is acknowledging some injustice Beasley experienced. This ambiguity is a jury question.

¶30. While not explicitly promising to pay Beasley $700,000, Sutton made various statements in 2009 through 2010 that could be inferred as a promise to pay these funds, as discussed in the previous issue. Beasley has presented evidence from which a jury might find that Sutton's conduct and statements led her to believe that he would pay her these funds and that she changed her position, or decided to enter into a contract to purchase an expensive new home, in reliance on this conduct. Accordingly, summary judgment was improper.

¶31. Additionally, we disagree with the trial court's finding on this claim that "everyone" understood Sutton's $100,000 payment to Beasley was a gift; this fact is disputed by Beasley, and other evidence suggests it could have been a partial payment for the $700,000. "Issues of fact sufficient to require denial of a motion for summary judgment obviously are present where one party swears to one version of the matter in issue and another says the opposite." *Williams v. Toliver*, 759 So. 2d 1195, 1198 (¶10) (Miss. 2000).

¶32. There is also a factual dispute over whether Beasley detrimentally relied on Sutton's statements and conduct when she entered into a contract to purchase a new home. In the fall of 2010, when Beasley lamented to Sutton that she could not afford a home that she and her husband wanted, Sutton told her "yes you can." On December 31, 2010, Beasley claimed she and her husband entered into a real-estate contract in reliance upon Sutton's supposed promises to pay her the remaining $600,000. In January 2011, Beasley realized Sutton would not be paying her any funds, but she had already entered into the housing contract. She also suddenly resigned from her job at the clinic. The affidavits of Clyde Spraberry (father to Spraberry and Beasley) corroborates the timing of Beasley's own testimony and that Sutton

15

reneged on an offer to pay her further funds. In a conversation with Sutton at the end of January 2011, Clyde stated:

> Dr. Sutton said he was not going to pay [Beasley] any monies; that the funds had been allocated to family for their future and he wasn't going to jeopardize the future of his family by making that kind of payment . . . . I told him that [in] most situations after death like this, greed becomes a factor. And I felt like that was the situation and that I didn't approve of it . . . .

The real-estate contract indicated if Beasley had reneged on it, she would be liable for breach of contract. Accordingly, we find a genuine issue of material fact regarding Beasley's claim for equitable estoppel.

### III. Promissory Estoppel

¶33. Beasley claims there is a genuine issue of material fact regarding this claim. We disagree. "[T]he elements of promissory estoppel are: (1) the making of a promise, even though without consideration, (2) the intention that the promise be relied upon and in fact is relied upon, and (3) a refusal to enforce it would virtually sanction the perpetuation of fraud or would result in other injustice." *Thompson v. First Am. Nat'l Bank*, 19 So. 3d 784, 788 (¶19) (Miss. Ct. App. 2009) (citing *C.E. Frazier Constr. Co.*, 373 So. 2d 1036, 1038 (Miss. 1979)). "Promissory estoppel differs from equitable estoppel 'in that the representation is promissory rather than as to an existing fact.'" *Weible v. Univ. of S. Miss.*, 89 So. 3d 51, 67 (¶52) (Miss. Ct. App. 2011) (quoting *Suddith v. Univ. of S. Miss.*, 977 So. 2d 1158, 1180 (¶52) (Miss. Ct. App. 2007)).

¶34. Here, there is no evidence that Sutton ever made an explicit promise to Beasley to pay her $700,000; therefore, summary judgment was proper for this claim. As discussed earlier,

16

the promise was merely implied by various comments and actions made by Sutton, and the figure of $700,000 was never expressly mentioned. Accordingly, we affirm summary judgment on this claim.

¶35. **THE JUDGMENT OF THE CIRCUIT COURT OF HARRISON COUNTY IS AFFIRMED IN PART AND REVERSED AND REMANDED IN PART FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. ALL COSTS OF THIS APPEAL ARE ASSESSED ONE-THIRD TO THE APPELLANT AND TWO-THIRDS TO THE APPELLEE.**

**LEE, C.J., IRVING AND GRIFFIS, P.JJ., MAXWELL, FAIR, AND JAMES, JJ., CONCUR. WILSON, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY CARLTON, J. ISHEE, J., NOT PARTICIPATING.**

**WILSON, J., DISSENTING:**

¶36. For the reasons I explain below, I would affirm the circuit court's order granting summary judgment in favor of Sutton as to all claims. Thus, I respectfully dissent.

¶37. The premise of Beasley's unjust enrichment claim is that Spraberry mistakenly cancelled a $700,000 whole-life policy that named her as the beneficiary when he intended to cancel a $2 million term policy that named Sutton as the beneficiary. I agree with the majority that there is evidence in the record from which a jury could so find. In addition, if Spraberry had been the owner of both policies, paid the premiums on both policies, and had the right to cancel both policies, then I could agree that Beasley's unjust enrichment claim should survive summary judgment. If those were the facts, then Sutton's receipt of the $2 million fairly could be viewed as an unjust windfall, and "good conscience and justice" might require him to "deliver to" Beasley at least what she lost as a result of Spraberry's mistake. *Omnibank of Mantee v. United S. Bank*, 607 So. 2d 76, 92 (Miss. 1992) (quoting *Hans v.*

*Hans*, 482 So. 2d 1117, 1122 (Miss. 1986)). That would be a relatively easy case to decide.

¶38.   The case before us is much more difficult. The facts are that Spraberry *was not the owner* and therefore *lacked authority* to cancel the $2 million policy. The policy named Sutton as the owner (and beneficiary) and provided: "While the insured is living, . . . *the owner alone has the right to receive all benefits and exercise all rights this policy grants . . .*" (Emphasis added.) The policy application, which the policy incorporates by reference, also provided that Sutton would pay the premiums, although Sutton testified that the premiums were actually paid by the clinic that he and Spraberry co-owned.

¶39.   It is true that Spraberry was a seventy-five percent shareholder in the clinic (Sutton owned the other twenty-five percent) and so, as a practical matter, he likely could have caused the clinic to stop paying the premiums on the policy. However, that would have required a discussion with Sutton, and there is no evidence that such a discussion ever occurred. Moreover, had it occurred, Sutton would have had the option of keeping the policy in force by paying the premiums himself.

¶40.   On these facts, Sutton's receipt of benefits under the policy is not an *unjust* windfall. It is simply his right as the owner of the policy, and Beasley has no claim—equitable or otherwise—on these funds. The majority's conclusion that the doctrine of unjust enrichment applies seems to derive from its view that "it is unlikely that Spraberry intended Sutton to receive a total of $5 million upon his death, when Sutton was only two years out of dental school." However, what "Spraberry intended" with regard to the $2 million policy is beside the point because he lacked the authority to cancel it. Thus, even if the $700,000 policy

18

naming Beasley as the beneficiary was cancelled by mistake, *Sutton's policy* did not remain in force by mistake. It remained in force because Sutton, not Spraberry or Beasley, owned the policy. Therefore, while Beasley's inability to recover under the cancelled policy may appear "unjust" in the everyday sense of the word, it does not follow that *Sutton* has been *unjustly* enriched. Nor does the law compel him to pay Beasley simply because he was "enriched" pursuant to his own insurance policy and so can afford to pay her.[15] Accordingly, I would affirm the circuit court's grant of summary judgment on Beasley's unjust enrichment claim.

¶41. The gravamen of Beasley's equitable and promissory estoppel claims is that after Spraberry died, Sutton made statements that led Beasley to believe that he would pay her $700,000, and that Beasley then bought a house in reliance on Sutton's statements. I agree with the circuit judge that Sutton is entitled to summary judgment on these claims because Beasley failed to create a genuine issue of material fact on the element of detrimental reliance.[16] Beasley testified that Sutton made clear that he would not pay her any additional

---

[15] As the Supreme Court emphasized in *Omnibank*,

> A person is enriched when he receives an economic benefit. . . . What is important and what careless readers often fail to remember is our law accepts no value condemning pursuit of wealth, so long as it be done within legal parameters. There is nothing inherently unjust about enrichment. The principle does not proscribe mere enrichments, only those objectively seen as unjust.

*Omnibank*, 607 So. 2d at 92; *see also* 1 Dan B. Dobbs, *Law of Remedies* §4.1(2) at 557 (2d ed. 1993) ("The fundamental substantive basis for restitution is that the defendant has been unjustly enriched . . . .").

[16] "Detrimental reliance is an element of both promissory estoppel and equitable estoppel." *Noble v. Wellington Assocs., Inc.*, 145 So. 3d 714, 721 (¶34) (Miss. Ct. App.

19

money after she had signed a contract on the house but before she closed. She testified that although she and her husband "did, in some way, count on" the money, they "had already fallen in love with the new home, . . . had made an offer and . . . were moving forward" despite Sutton's alleged change of position. She acknowledged that they qualified for a home loan that was not based on Sutton's alleged promises and that they successfully closed on the home, at a purchase price of $305,000, without assistance from Sutton. There is no evidence in the record that Sutton caused Beasley to breach her real estate contract, that she has been unable to make payments on the house, or that she has suffered any other detriment as a result. Thus, the most that the record suggests is that Sutton induced Beasley to purchase a new house that she had "fallen in love with" and could afford. I agree with the circuit judge that even if this is reliance, it is not *detrimental* reliance. Accordingly, I would affirm the grant of summary judgment on Beasley's estoppel claims as well.

**CARLTON, J., JOINS THIS OPINION.**

---

2013) (quotation marks omitted).