# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2024-CA-00692-COA

IN RE ESTATE OF PATRICIA LOVORN
EAVES, DECEASED, AND ESTATE OF JOHN
ARTHUR EAVES SR., DECEASED: TIFFANY
LADAIR EAVES SCHLESINGER AND PAIGE
LEIGH EAVES RAY

APPELLANTS

v.

JOHN ARTHUR EAVES JR., INDIVIDUALLY
AND AS FORMER EXECUTOR DE BONIS NON

APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 05/15/2024 |
| TRIAL JUDGE: | HON. JAMES CHRISTOPHER WALKER |
| COURT FROM WHICH APPEALED: | MADISON COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANTS: | REEVE G. JACOBUS JR. |
| | J. CHASE BRYAN |
| | MACY ELIZABETH MITCHELL |
| ATTORNEYS FOR APPELLEE: | SHELDON G. ALSTON |
| | CLAIRE W. KETNER |
| | E. CHARLENE STIMLEY PRIESTER |
| | MELVIN VINCENT PRIESTER JR. |
| NATURE OF THE CASE: | CIVIL - WILLS, TRUSTS, AND ESTATES |
| DISPOSITION: | AFFIRMED - 02/10/2026 |
| MOTION FOR REHEARING FILED: | |

**BEFORE BARNES, C.J., WEDDLE AND LASSITTER ST. PÉ, JJ.**

**WEDDLE, J., FOR THE COURT:**

¶1.     John Arthur Eaves Sr. and Patricia Lovorn Eaves were married and had three children; John Arthur Eaves Jr., Tiffany Ladair Eaves Schlesinger, and Paige Leigh Eaves Ray. Patricia lost her battle with pancreatic cancer on March 22, 2020, leaving the bulk of her estate to John Sr. Following Patricia's death, John Sr. disposed of the majority of his estate through conveyances to his and Patricia's children and through an assignment of his law firm

to John Jr.[1] John Sr. died on March 18, 2022.

¶2.     After several unsuccessful meetings and conversations among the siblings regarding John Sr.'s estate, John Jr. ultimately filed for probate. Tiffany and Paige filed various pleadings in the probate of their parents' consolidated estates challenging the validity of the inter vivos conveyances and the law firm assignment.[2] Tiffany and Paige believed these transactions were the result of undue influence arising from an alleged confidential relationship between John Sr. and John Jr. Tiffany and Paige further alleged that John Jr. should be estopped from asserting that they were not entitled to certain promises made by John Sr. and John Jr. upon which they detrimentally relied. Following a bench trial, the chancellor denied Tiffany and Paige's request to set aside the inter vivos conveyances and the law firm assignment. Aggrieved by the chancellor's opinion and judgment, they appeal. In addition to the issues presented in the chancery court, Paige and Tiffany also assert that the chancellor erred during trial by interfering with the cross-examination of an expert witness, the duration and nature of which allegedly constituted prejudicial error. Finding no error, we affirm.

## FACTS AND PROCEDURAL HISTORY

_____

[1] John Sr. also fathered two children outside his marriage who lived in Ukraine. Although John Sr.'s children from Ukraine claimed heirship, they did not join Paige and Tiffany's contest of the conveyances by John Sr., nor did they contest John Sr.'s will. Therefore, no issues on appeal directly involve those children.

[2] Although the Estates of John Sr. and Patricia were consolidated, the issues before the chancery court and this Court on appeal exclusively pertain to John Sr.'s estate.

¶3.    John Sr. and Patricia owned a substantial amount of real estate investments and assets. John Sr. and Patricia owned property in Oxford, Jackson, Ocean Springs, Flora, and Winston County, Mississippi, as well as Venezuela, Ukraine, and the Andover Subdivision in Madison County, Mississippi. John Sr. and Patricia also lived on a large estate in Canton, Mississippi, with a chapel and three houses known as Rosemeade, Rosebud, and Rosemore. John Sr. owned a successful law practice in Jackson known by various names through the years: Eaves Law Office, the Law Offices of John Arthur Eaves, or the John Arthur Eaves Law Office. Although John Jr. owned his own law firm, he and John Sr. worked together on cases and often shared attorney's fees.[3] One such matter involved a lawsuit filed relating to the 1998 terrorist bombings of the United States Embassies in Kenya and Tanzania ("Sudan lawsuit").

¶4.    Patricia passed away in March 2020, leaving a holographic last will and testament dated June 7, 2009. In Patricia's will, she appointed John Sr. as executor, and she left all her property to John Sr. She also left $1,000 to "each of [John Sr.'s] children." During the reading of Patricia's will, John Sr. allegedly mentioned that any settlement he received from the Sudan lawsuit would be equally split between him and John Jr. According to Tiffany and Paige, John Sr. also promised that there would be a one-third split among them and John Jr. of his share of the fees. John Jr. testified that it was actually his idea to have a one-third split,

_____

[3] John Jr. and Tiffany testified that it was always assumed among the siblings that John Jr. would receive the law firm after John Sr.'s death.

3

and he did not recall John Sr. making statements consistent with Tiffany and Paige's claims.

¶5.     After Patricia's death, Tiffany and her husband moved into Rosemeade to take care of John Sr. On April 21, 2020, John Sr. executed a holographic last will and testament appointing John Jr. as executor. The will included specific devises of property to John Jr., Paige, and Tiffany, gave each of his children $10,000, and split any residuary equally among John Jr., Paige, and Tiffany. The will also provided that John Jr. would receive twenty acres of the Rosemeade property, Paige would receive Rosemore, and Tiffany would receive Rosebud. The rest of Rosemeade would be split equally among the three children. Several weeks later, John Sr. named John Jr., Paige, and Tiffany as the payable-on-death beneficiary on three certificates of deposit (CD) worth $250,000 at RiverHills Bank. John Sr. named all his grandchildren as the beneficiaries of an additional CD worth $25,000. On June 8, 2020, John Sr. added John Jr. as the payable-on-death beneficiary on all his bank accounts at RiverHills Bank. Tiffany testified that John Sr. was competent at the time he executed his will in April 2020.

¶6.     On July 25, 2020, John Sr. assigned all his cases, clients, fees and interest due, money in any and all operating or trust business accounts, and the entirety of his law firm to John Jr. Renee Hitt, John Jr.'s paralegal, drafted and notarized the assignment.[4] During trial and on appeal, Tiffany and Paige argued that there was no evidence that the assignment of John

---

[4] Testimony at trial revealed that although Renee was John Jr.'s paralegal, she occasionally would work for John Sr. as well.

Sr.'s trust account, business accounts, and clients were implemented. However, law firm employees testified that during this time period, John Sr. stopped taking on new clients or cases, and he began coming into the office less. John Sr. did continue to participate in calls pertaining to the Sudan lawsuit settlement and handled personal matters, and his bank accounts remained in effect.[5]

¶7.    Prior to his death, John Sr. gave John Jr. his power of attorney, which allowed John Jr. "upon [John Sr.'s] disability or incapacity" to "collect and distribute Receivables in accordance with that certain Purchase Agreement . . . by and between Law Offices of John Arthur Eaves and Champlain Funding Co LLC." John Jr. testified that he and his father took out an advance on the legal fees from the Sudan lawsuit, and they both lived off this money. John Jr. testified that the power of attorney was never utilized.

¶8.    On August 3, 2020, John Sr., both individually and as executor of Patricia's estate, executed deeds granting various pieces of property to John Jr., Paige, and Tiffany (individually and some to all three together). On September 15, 2020, nine of those deeds were recorded in Hinds County. Renee testified that John Sr. would ask her to draft these documents and keep them until he told her to record them at a later date.

¶9.    On June 5, 2021, John Sr. executed a specific medical power of attorney appointing

---

[5] Judy Carver, a long-time employee of Eaves Law Office, helped John Sr. with his personal finances. She testified that during the summer of 2020, John Sr. told her that everything with the law firm would go to John Jr. and that he "was her new boss." She also testified that John Sr. told her there was no need to change the name on the bank accounts because he and John Jr. had the same name.

John Jr., Paige, and Tiffany as his attorneys in fact to make any health care decisions for him if he became unable to give informed consent. The power of attorney specified that Tiffany would have the final word if they could not agree on decisions concerning John Sr.'s health care. The same day, John Sr. signed five quitclaim deeds related to various properties across Mississippi. He deeded the following to John Jr.: 739.5 acres in Oxford, the Holman Addition in Louisville, the Winston County property, and the Ocean Springs property. Tiffany and Paige both testified that John Sr. mentioned on several occasions that some or all of the Oxford property would be equally split among all three of them. However, John Jr. testified that John Sr. told him that he gave him the Oxford property because he was in a better position to satisfy the repayment of loans against the property. John Sr. also deeded six acres in Oxford to John Jr., Tiffany, and Paige. Renee drafted and notarized all these deeds. Renee testified that she recorded them after approval from John Sr. Paige testified that the day these deeds were drafted, she remembered taking John Sr. to the doctor for radiation treatment, and he was in pain. She also testified that she was living with John Sr. at the time, and she did not recall Renee coming to Rosemeade to present the quitclaim deeds to John Sr. Also in June 2021, John Sr. insisted on and was able to travel to Ukraine by himself.

¶10.    On January 28, 2022, Renee recorded two deeds for the Oxford property on John Sr.'s behalf, and he executed a bill of sale to John Jr. for his property in Venezuela.[6] On February

---

[6] The bill of sale for the Venezuela property was signed and notarized, but it was never recorded.

25, 2022, five quitclaim deeds were allegedly executed by John Sr. The details of those deeds are as follows: (1) 309 Magnolia Street and a property in Oxford known to the family as the "Thacker Mountain Chalet" to John Jr., Paige, and Tiffany equally; (2) all of John Sr.'s Andover property to John Jr., Paige, and Tiffany equally; (3) a leasehold in Flora to Paige; (4) twenty-one acres at Rosemeade to John Jr.; and (5) the remainder of Rosemeade to John Jr., Paige, and Tiffany equally. He also executed an assignment to John Jr. for his Ukrainian property.

¶11.    In March 2022, John Sr. was admitted to Baptist Hospital. According to testimony, John Sr. called his banker of fourteen years, Jud Watkins, to ask him to add John Jr. to all his accounts in case he became incapacitated. Jud came to the hospital to have John Sr. sign the paperwork to create a new joint bank account in his and John Jr.'s name. Jud and John Jr. testified that only Jud went into the hospital room with John Sr. Jud also testified that nothing made him suspect that John Sr. lacked free will or that he was under the control of anyone.

¶12.    On March 18, 2022, John Sr. died. In April 2022, there was a reading of John Sr.'s will. Tiffany testified that it was her understanding that John Jr. would be handling John Sr.'s estate. At this same meeting, John Jr. allegedly promised Tiffany and Paige that he would give them a portion of the Sudan lawsuit settlement. Renee was present at the meeting to answer any questions Tiffany and Paige had after the reading of the will. At the conclusion of the meeting, John Jr., Paige, and Tiffany agreed to obtain appraisals for John Sr.'s various properties. They had several meetings and conversations about the appraisals and the Sudan

7

lawsuit settlement.

¶13. On December 23, 2022, Paige sent an email to John Jr. and Tiffany reiterating how they "agreed" the Sudan lawsuit settlement should be handled. John Jr. testified that he did not respond to Paige's email because he was not going to be forced into acknowledging what he believed to be an inaccurate statement. John Jr. maintained that he was going to give Tiffany and Paige portions of the Sudan lawsuit settlement, but he was not obligated to do so.

¶14. In January 2023, John Jr., Paige, and Tiffany held an unsuccessful meeting regarding John Sr.'s estate and appraisals of his properties. During this meeting, John Jr. presented a binder to Tiffany and Paige detailing how John Sr.'s assets would be distributed. On January 23, 2023, John Jr. filed a "Petition for Probate of Last Will and Testament, Appointment of Executor, and for Letters Testamentary." Tiffany and Paige filed an emergency motion to freeze assets, appoint special masters, compel inventory, and remove John Jr. as executor.

¶15. During the lengthy trial, the chancellor heard testimony from eleven witnesses, including two expert witnesses, and received several exhibits. John Jr. presented the expert testimony of a forensic psychologist, Dr. Max Wachtel. Dr. Wachtel testified that John Sr. had testamentary and contractual capacity when he signed the contested documents and the law firm assignments. On rebuttal, Paige and Tiffany offered the testimony of a psychiatrist, Dr. Mark Webb. He testified that he believed John Sr. had testamentary capacity, but he also believed John Sr. was more likely than not overtaken by undue influence because he was

8

physically and mentally weak.

¶16.    On May 15, 2024, the chancellor entered a detailed opinion and judgment denying Paige and Tiffany's request to set aside quitclaim deeds and the law firm assignment and denying all other requests before the court.[7] On May 30, 2024, the chancellor confirmed and recognized the opinion and judgment as a final judgment under Mississippi Rule of Civil Procedure 54(b).

¶17.    On June 24, 2024, Tiffany and Paige filed an amendment to the designation of record on appeal requesting that the trial transcript be time-stamped, and they requested that the court reporter produce the audio recording made during the cross-examination of Dr. Wachtel. On July 22, 2024, the chancellor sua sponte entered an order ruling that the court reporter's audio recordings were work product and shall not be included as part of the official appellate record. Aggrieved, Paige and Tiffany appeal.

**STANDARD OF REVIEW**

¶18.    "A chancellor's findings of fact will not be disturbed unless they are manifestly wrong or clearly erroneous, or unless the chancellor applied an erroneous legal standard. If the chancellor's findings are supported by substantial credible evidence in the record, [our appellate courts] will not reverse." *Wright v. Roberts*, 797 So. 2d 992, 997 (¶14) (Miss. 2001) (citing *In re Est. of Grantham*, 609 So. 2d 1220, 1223 (Miss. 1992)). "Questions of law are

---

[7] Notably, the chancellor provides a thorough analysis of John Sr.'s mental capacity, but Paige and Tiffany maintain that John Sr. never lacked the requisite mental capacity to execute his will, the deeds, or the assignment at issue.

reviewed de novo." *Crotwell v. T&W Homes*, 318 So. 3d 1117, 1121 (¶11) (Miss. 2021) (quoting *Browder v. Williams*, 765 So. 2d 1281, 1284 (¶12) (Miss. 2000)).

## DISCUSSION

### I. Inter Vivos Gifts

¶19. We first address Tiffany and Paige's argument that the deeds and law firm assignment fail to meet the requirements associated with valid inter vivos gifts. A party attempting to prove that an inter vivos gift was made must show by clear and convincing evidence that (1) the donor was competent to make a gift, (2) the donation was a voluntary act by a donor with donative intent, (3) the gift was complete and not conditional, (4) delivery was made, and (5) the gift was irrevocable. *In re Estate of Ladner*, 909 So. 2d 1051, 1054 (¶9) (Miss. 2004).[8] There is no evidence or testimony in the record to support a finding that the assignment and the deeds were conditional. The language of the assignment was clear, and testimony from the firm's employees shows that John Sr. ceded operational control. The assignment was signed by John Sr. and John Jr. and notarized. Thus, the assignment became irrevocable upon execution and delivery. As to the deeds, specifically, there is a presumption that the deeds were delivered and became effective the day they were recorded. *See Morrow v. Morrow*, 129 So. 3d 142, 147 (¶17) (Miss. 2013). Tiffany and Paige failed to rebut the presumption that the recorded contested deeds were delivered. Accordingly, we find that the quitclaim

---

[8] Paige and Tiffany only contest the last three elements. It is undisputed that John Sr. was competent and had the required donative intent.

deeds and the assignment were valid inter vivos gifts made by John Sr.

¶20.    We next address Tiffany and Paige's argument that the chancellor erred by finding several inter vivos gifts valid because an alleged confidential relationship existed between John Sr. and John Jr. Tiffany and Paige also allege that John Sr. was in poor health and must have been under the influence of John Jr. when he made various inter vivos gifts, particularly the quitclaim deeds and assignment. The chancellor found that Tiffany and Paige failed to prove the existence of a confidential relationship, and even if the sisters had successfully invoked the presumption of undue influence, John Jr. rebutted any presumption by clear and convincing evidence.

¶21.    Mississippi law on confidential relationships and undue influence is well settled and applies "to both inter vivos and testamentary transactions." *Est. of Warren v. Maharrey*, 402 So. 3d 167, 183 (¶59) (Miss. Ct. App. 2024) (citing *Wright*, 797 So. 2d at 998 (¶16)). Mississippi law clearly recognizes that "an inter vivos gift is a perfectly lawful means of transferring real property in this state." *In re Est. of Lane*, 930 So. 2d 421, 425 (¶11) (Miss. Ct. App. 2005) (citing *Anderson v. Burt*, 507 So. 2d 32, 36 (Miss. 1987)). Gifts of real property between family members are a normal occurrence, and our courts will not act when a conveyance from a parent to a child is a purely voluntary act. *Id*. In fact, "a deed from a parent to a child alone and of itself raises no presumption of undue influence since, in the absence of evidence to the contrary, the parent is presumably the dominant party. This is true even though the parent is aged, or aged and infirm." *Id*.

11

¶22.    However, this Court will act if the existence of a confidential relationship is proved by clear and convincing evidence. *Id*. at 425 (¶12). Once a confidential relationship is proved, "[t]he burden shifts then to the one who wishes to uphold the gift to rebut the presumption by clear and convincing evidence." *In re Caspelich*, 22 So. 3d 1199, 1205 (¶19) (Miss. Ct. App. 2009). The Mississippi Supreme Court has defined a confidential relationship as follows:

> Whenever there is a relationship between two people in which one person is in a position to exercise dominant influence upon the other because of the latter's dependency upon the former, arising either from weakness of the mind or body, or through trust, the law does not hesitate to characterize such a relationship as fiduciary in character.

*In re Smith*, 170 So. 3d 530, 536 (¶15) (Miss. Ct. App. 2014). In the case before us, the chancellor found that "John Sr.'s poor health and age assuredly created the potential for the fostering of a confidential relationship, but there were natural safeguards in place."[9] The chancellor also noted that although John Sr. was physically weak at times, he still traveled internationally by himself and remained highly independent. When determining whether a confidential relationship exists, the following factors are to be considered:

> (1) whether one person has to be taken care of by others, (2) whether one person maintains a close relationship with another, (3) whether one person is provided transportation and has [his] medical care provided for by another, (4) whether one person maintains joint accounts with another, (5) whether one is physically or mentally weak, (6) whether one is of advanced age or poor health, and (7) whether there exists a power of attorney between the one

---

[9] The chancellor also noted that John Jr., Tiffany, and Paige all seemed to be in a confidential relationship with John Sr.

[person] and another.

*In re Est. of Laughter*, 23 So. 3d 1055, 1063 (¶31) (Miss. 2009) (citing *In re Est. of Holmes*, 961 So. 2d 674, 680 (¶17) (Miss. 2007)).

¶23. If Paige and Tiffany were able to demonstrate the existence of a confidential relationship between John Sr. and John Jr., a rebuttable presumption of undue influence would arise regarding any inter vivos transactions between them. *See Holcombe v. Est. of King*, 365 So. 3d 1037, 1043 (¶36) (Miss. Ct. App. 2023) (finding that a party must first establish a confidential relationship existed before addressing the question of undue influence). The record reveals that Paige and Tiffany failed to demonstrate the existence of a confidential relationship between John Sr. and John Jr. Paige, Tiffany, and John Jr. all assisted in the care of John Sr. Paige and Tiffany took care of John Sr. more often than John Jr. Paige and Tiffany drove John Sr. to his appointments, and they both lived with him at some point after the death of Patricia. Paige and Tiffany's expert witness testified that he believed John Sr. had a confidential relationship with John Jr., Paige, and Tiffany. Paige and Tiffany also received payment for their services as caregivers for John Sr.

¶24. Although a power of attorney existed between John Sr. and John Jr., there was undisputed testimony that the power of attorney was never used. Several witnesses testified John Sr. was not solely reliant on any caregiver when he executed the contested documents. There was overwhelming testimony from witnesses that John Sr. was self-sufficient and not dependent on anyone when it came to making his own financial and estate-planning

13

decisions. During the time the contested documents were executed, John Sr. still negotiated contracts, traveled internationally alone, represented himself in real estate closings, and wrote checks.

¶25. After our review of the record and considering relevant factors, we find the inter vivos gifts were valid, and the chancellor correctly held that John Jr. and John Sr. did not have a confidential relationship that would render the inter vivos gifts and assignment invalid. Accordingly, we find that the chancellor's findings were supported by substantial credible evidence and not manifestly wrong or clearly erroneous.

## II. Doctrines of Equitable, Promissory, and Quasi Estoppel

¶26. Tiffany and Paige next argue that they relied on the actions of John Jr. and changed their position in reliance on John Sr. and John Jr.'s promise to give them a portion of the Sudan lawsuit settlement. The chancellor found that the doctrines of equitable, promissory, and quasi estoppel were inapplicable because there was no evidence presented at trial that Tiffany and Paige suffered a detriment in reliance on any gratuitous promise by John Jr. On appeal, Tiffany and Paige specifically contend that the chancellor erroneously applied the doctrines of equitable, promissory, and quasi estoppel.

### A. Equitable Estoppel

¶27. "A party asserting equitable estoppel must show (1) that [she] has changed [her] position in reliance upon the conduct of another and (2) that [she] has suffered detriment caused by [her] change of [her] position in reliance upon such conduct." *Merideth v.*

14

*Merideth*, 987 So. 2d 477, 484 (¶22) (Miss. Ct. App. 2008) (citing *Turner v. Terry*, 799 So. 2d 25, 37 (¶42) (Miss. 2001)). Tiffany and Paige argue that they "relied on the conduct of John Jr. in the conduct of their father's estate, the handling of the Sudan lawsuit settlement, and unwittingly allowed him to take advantage of their trust."

¶28. "When applying the doctrine of equitable estoppel, 'the test is whether it would be substantially unfair to allow a person to deny what he has previously induced another to believe and take action thereon.'" *Craig v. City of Yazoo City*, 104 So. 3d 172, 175 (¶10) (Miss. Ct. App. 2012) (quoting *Mayor & Bd. of Aldermen, City of Clinton v. Welch*, 888 So. 2d 416, 427 (¶51) (Miss. 2004)). Tiffany and Paige testified that John Jr. and John Sr. told them that the Sudan lawsuit settlement would be equally split among them. According to testimony at trial, at their final meeting regarding the distribution of assets, John Jr. presented a binder that allegedly included a settlement offer to give Tiffany and Paige a portion of the Sudan lawsuit settlement.[10] However, Tiffany and Paige did not agree to those figures because they believed they were entitled to more based on previous conversations about the Sudan lawsuit settlement. Here, there is no evidence or testimony that Paige and Tiffany changed a prior position in reliance upon John Jr.'s alleged conduct or promise, nor did they show how they suffered any detriment or injury in reliance upon John Jr.'s conduct or

---

[10] The chancellor initially did not allow the settlement binder to be admitted for the purpose of proving the validity of Tiffany and Paige's claim. The binder was later admitted for the limited purpose of testimony to an alleged plan by John Sr. and John Jr. to distribute the estate.

15

promise. Accordingly, we find that there was no error in the chancellor's finding that the doctrine of equitable estoppel should not be enforced.

### B. Promissory Estoppel

¶29. Tiffany and Paige next argue that "John Jr. should be estopped from failing to pay the Sudan lawsuit settlement into the estate for distribution in accordance with the will and the promise that John Sr. and John Jr. made to them." "[T]he elements of promissory estoppel are: (1) the making of a promise, even though without consideration, (2) the intention that the promise be relied upon and in fact is relied upon, and (3) a refusal to enforce it would virtually sanction the perpetuation of fraud or would result in other injustice." *Beasley v. Sutton*, 192 So. 3d 325, 335 (¶33) (Miss. Ct. App. 2015) (citing *Thompson v. First Am. Nat'l Bank*, 19 So. 3d 784, 788 (¶19) (Miss. Ct. App. 2009)). "Promissory estoppel differs from equitable estoppel 'in that the representation is promissory rather than as to an existing fact.'" *Id.* (citing *Weible v. Univ. of S. Miss.*, 89 So. 3d 51, 67 (¶52) (Miss. Ct. App. 2011)).

¶30. Tiffany and Paige contend that they allowed John Jr. to move into Rosemeade and live there rent-free in reliance on his promise to honor his father's wishes to give them a portion of the Sudan lawsuit settlement. However, we note that the quitclaim deed John Sr. executed on February 25, 2022, gave John Jr. an ownership interest in Rosemeade. Based on our review of the record, John Jr. may have promised Tiffany and Paige a portion of the Sudan lawsuit settlement, but they again failed to show how they relied on John Jr.'s promise. As co-tenants of Rosemeade, each of the siblings has equal rights to occupy the property.

16

Although Tiffany and Paige contend that they would not have allowed John Jr. to move into Rosemeade and live there rent-free if it were not for his promises to honor John Sr.'s alleged wishes, John Jr. has the right, as a co-tenant, to live in Rosemeade.[11] Therefore, we find that chancellor did not err in finding promissory estoppel does not apply here.

### C. Quasi Estoppel

¶31. Tiffany and Paige argue that the chancellor erroneously applied the doctrine of quasi estoppel to the claim that the Sudan lawsuit settlement funds should have been made part of the estate. Quasi estoppel "precludes a party from asserting, to another's disadvantage, a right inconsistent with a position it has previously taken, and applies when it would be unconscionable to allow a person to maintain a position inconsistent with one to which he acquiesced, or from which he accepted a benefit." *Home Base Litter Control LLC v. Claiborne County*, 183 So. 3d 94, 101-02 (¶26) (Miss. Ct. App. 2015) (internal quotation marks omitted). In his final judgment, the chancellor noted how the sisters profited from their reliance on the Andover quitclaim deed but now seek to set it aside. He also pointed out how they cashed checks worth thousands of dollars from their father after the point they now allege he was incapacitated and incapable of divesting himself of his property. Paige and Tiffany specifically contend that in reliance on John Jr.'s statements, they did not seek to have an independent executor appointed for ten months after John Sr.'s death, allowed John Jr. to live at Rosemeade rent-free, and relied on him to fulfill their father's promise to

---

[11] Notably, Paige stated in her brief that a partition action is pending.

them. Nonetheless, Paige and Tiffany again have failed to show how they have been disadvantaged or how it would be unconscionable to allow John Jr. to maintain his position. Therefore, we find that the chancellor did not err in finding the doctrine of quasi estoppel applies here, but it does not apply to John Jr.'s behavior because neither sister shows how she has been disadvantaged or how John Jr. repudiated any obligations.

### III.    Cross-examination of an Expert Witness

¶32.    In their last assignment of error, Tiffany and Paige argue that the chancellor "interfered with the prosecution of the case by improperly limiting cross examination in violation of Mississippi Rule of Evidence 611(b)." Rule 611(b) provides that a court may not limit cross-examination to the subject matter of the direct examination and matters affecting the witness's credibility. MRE 611(b). An expert witness is subject to "wide-open cross-examination" on "any matter that is relevant." *Murray v. Gray*, 321 So. 3d 1166, 1180 (¶43) (Miss. Ct. App. 2020) (citing *Redding v. Miss. Transp. Comm'n*, 169 So. 3d 958, 964 (¶21) (Miss. Ct. App. 2014)). While defense counsel has wide latitude in cross-examination, "the trial court in its discretion has the inherent power to limit cross-examination to relevant matters." *Farmer v. State*, 301 So. 3d 731, 734 (¶12) (Miss. Ct. App. 2020) (quoting *Mixon v. State*, 794 So. 2d 1007, 1013 (¶20) (Miss. 2001)).

¶33.    During the cross-examination of John Jr.'s expert witness, Dr. Wachtel, about undue influence, Paige's counsel attempted to go through John Jr.'s deposition transcript. On appeal, Paige argues that the chancellor indicated that if the line of questioning was to

18

continue, he would end the day and push the trial to a later date. However, as the appellee correctly points out, Paige's counsel failed to make a proffer of Dr. Wachtel's testimony. It is well established that "[w]hen testimony is not allowed at trial, a record of the proffered testimony must be made in order to preserve the point for appeal." *Jackson v. State*, 245 So. 3d 433, 441 (¶45) (Miss. 2018) (quoting *Green v. State*, 89 So. 3d 543, 554 (¶28) (Miss. 2012)). The record does not include a proffer; therefore, this issue has not been properly preserved for appeal. Accordingly, this issue is procedurally barred.

¶34.    Notwithstanding the procedural bar, we find this issue is without merit. Our review of the record reveals that the chancellor did not limit the cross-examination of Dr. Wachtel but, instead, tried to prevent Paige's counsel from causing unnecessary delay by reading a deposition transcript. Rule 611(a)(2) provides that "the court should exercise reasonable control over the mode and order of examining witnesses and presenting evidence" to avoid wasting time. *Johnson v. State*, 311 So. 3d 1161, 1173 (¶23) (Miss. Ct. App. 2020). On cross-examination, Paige's counsel first stated, "In Mississippi, once a—so confidential relationship is kind of a separate entity. It doesn't have to be conflated with the act of undue influence. Do you understand that the way I'm presenting it? You can disagree. That's the way I understand." Counsel for John Jr. objected, stating that Dr. Wachtel needed a question as opposed to his interpretation of the law. The chancellor stated, "A question would be nice." Later in the cross-examination of Dr. Wachtel, Paige's counsel seemingly attempted to read into the record a few pages of John Jr.'s deposition transcript. He stated, "If you want

to[,] I just want to go over these three pages here and read it. And if you would, to make it clear, I'll ask the question, and you can answer." In an attempt to avoid Paige's counsel wasting time by reading through three pages of a deposition transcript on the third day of trial, the chancellor asks Paige's counsel to ask a question. After Paige's counsel tried to explain that he wanted to read through the transcript because Dr. Wachtel did not remember, the chancellor interrupted him and asked what their schedules were for Monday. He added, "Mr. Jones doesn't want to do what I asked, so what are y'all doing Monday?" Counsel and the witness provided their scheduling conflicts, and the court took a short recess. After the recess, Paige's counsel tendered the witness.

¶35. After our review of the record, we find that the chancellor acted within his discretion when he requested Paige's counsel to ask Dr. Wachtel a question and not read three pages of a deposition transcript.

## CONCLUSION

¶36. Based on the foregoing reasons, we find that the chancellor's findings were supported by substantial credible evidence and not manifestly wrong or clearly erroneous. Accordingly, we affirm the chancellor's final judgment.

¶37. **AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., WESTBROOKS, McDONALD, LAWRENCE, EMFINGER AND LASSITTER ST. PÉ, JJ., CONCUR. WILSON, P.J., AND McCARTY, J., CONCUR IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**